Edward Murtagh **DEMPSEY, Plaintiff,**

v.

**TOWN OF BRIGHTON, Eugene Shaw, Chief of Police of the Town of Brighton, Officers Thomas Sleep, Robert E. Hickey and Fred J. Mellini, Sergeant William La Ronde, and John Does 1 through 6, Defendants.**

Mark S. **CURENTON, Plaintiff,**

v.

**TOWN OF BRIGHTON, Eugene Shaw, Chief of Police of the Town of Brighton, Officers Thomas Sleep, Robert E. Hickey and Fred J. Mellini, Sergeant William La Ronde, and John Does 1 through 6, Defendants.**

Civ. Nos. 88–726L, 88–930L.

United States District Court,
W.D. New York.

Oct. 29, 1990.

Charles B. Kenning, Kenning & Edelman, Rochester, N.Y., for plaintiff Dempsey.

Charles L. Davis, Buffalo, N.Y., for plaintiff Curenton.

Jane Conrad, Harter, Secrest & Emery, Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

Plaintiffs Edward Murtagh Dempsey and Mark S. Curenton brought these two actions pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1988 to recover damages allegedly suffered when defendant officers of the Brighton, New York, Police Department mistakenly detained them upon suspicion of bank robbery.

Plaintiffs move for partial summary judgment on their claims of false arrest and excessive force. Defendants cross-move for partial summary judgment on the issues of negligent training and supervision. For the reasons that follow, I find that this incident was an investigatory stop made upon appropriate reasonable suspicion, and consequently grant summary judgment in favor of the defendants and dismiss the complaint.

## I. BACKGROUND

The facts material to this motion are not disputed. This is a case of mistaken identity. It arises out of the June 12, 1987 detention of plaintiffs by members of the Brighton, New York, Police Department on suspicion of bank robbery.

### A. *The Facts*

On June 12, 1987, at approximately 1:30 in the afternoon, a man entered the Monroe Savings Bank on Monroe Avenue in Brighton and handed the teller a note. The note, written on a brown paper bag, directed the teller to hand over all of her one, five and ten dollar bills. Although the bank robber made reference to a gun during the course of the hold-up, no weapon was actually seen. Eyewitnesses agreed that the robber placed the cash in a paper bag and fled the bank on foot heading toward the City of Rochester.

Immediately after the robbery, the branch manager of the bank notified the Brighton Police Department of the incident and gave the police dispatcher a description of the robber. The initial information broadcast to the Brighton police units on patrol described the robber as "a young black male wearing a blue jacket, unknown if a weapon was shown. Last seen heading towards the city on foot on Monroe Avenue." Radio Transmission Tape for June 12, 1987, Side A, Tape 2, at 2.

Several minutes later, the police dispatcher broadcast the following description of the robber:

> You are looking for a male black, 6 foot, slim built, wearing a long-sleeved purple shirt, blue jeans, tan hat with a chin strap, sunglasses. Do not have a description on any vehicle. Last seen on foot towards the city on Monroe Avenue. A gun was threatened but none displayed.

Radio Transmission Tape, Side A, Tape 2, at 11.

Brighton Police Officer Thomas Sleep, a seventeen year veteran with the force, was assigned to patrol the area near the bank. About an hour after the robbery, as police combed the area for a suspect, Officer Sleep spotted plaintiff Mark S. Curenton

("Curenton"), a black man, at the corner of Highland and Monroe Avenues. This location is about four-tenths of a mile "towards the city" of Rochester from the bank. According to Officer Sleep, Curenton—who stands about six feet tall and was wearing blue clothing and sunglasses—emerged from some shrubbery near the street corner carrying a bag and jumped into a waiting car. Deposition of Thomas Sleep, November 27, 1989, at 438–40, 460–63; Radio Transmission Tape, Side A, Tape 2, at 17–18. Curenton strongly denies that he came out from behind bushes. Rather, Curenton claims that he was standing on the curb or sidewalk when Officer Sleep first saw him. Deposition of Mark S. Curenton, February 17, 1988, at 13–14; deposition of Edward M. Dempsey, November 22, 1989, at 283–84.

It is undisputed, however, that as Sleep looked on with mounting interest a compact blue Toyota driven by a white man stopped to pick up Curenton. The driver and owner of the car was plaintiff Edward Murtagh Dempsey ("Dempsey"), a friend and college classmate of Curenton's. It was apparently the two men's custom to meet each day at an appointed time near the Monroe–Highland intersection in question. Dempsey would then pick up Curenton and the two would drive together to the local lumberyard where they both worked.

Officer Sleep, mistakenly suspecting that he had picked up the trail of robbery suspects, followed Dempsey and Curenton for a short distance in his police cruiser. Before long, Sleep determined to stop the two.

Defendants acknowledge that two New York State Police troopers in separate cruisers were also patrolling the vicinity of Monroe and Highland at this time. The troopers apparently spotted Curenton, but concluded that he did not fit their description of the bank robber. However, it appears that their description of the robber may have been different than the one Sleep had because the state troopers did not receive the Brighton police radio frequency.

After a call to Brighton Police headquarters confirming the bank robber's description and requesting help, Sleep turned on his flashers and pulled over Dempsey's Toyota.

Sleep acted under so-called "felony-stop" procedures, which the Brighton police are trained to employ in potentially violent encounters. Under these procedures Sleep, without leaving his cruiser's side, unholstered his gun and over the cruiser's public address system ordered Dempsey to throw his car keys out of the driver's window. Dempsey did so. Sleep then ordered both Dempsey and Curenton to put their hands on the car's windshield where he could see them. They did so. Lastly, the policeman ordered Curenton, and then Dempsey, to crawl out of the passenger's side of the Toyota and lay face down on the grass. Still at gunpoint, plaintiffs complied.

While all this was occurring, backup arrived in the form of defendant Officers Robert E. Hickey and Frederick J. Mellini. More officers may have come onto the scene shortly thereafter. These officers approached plaintiffs with weapons drawn, in order to search them. During this time the police maintain that they kept their guns trained on plaintiffs for no more than a couple of minutes, until plaintiffs were handcuffed and searched. Plaintiffs say it was longer.

Though the plaintiffs apparently put up no resistance, it is undisputed that Dempsey was yelling and thrashing about. Dempsey Deposition at 307; Deposition of Frederick Mellini, November 27, 1989, at 584; Deposition of Robert Hickey, November 27, 1989, at 796. Dempsey also demanded that the Brighton Town Supervisor, a friend of Dempsey's, be contacted. Dempsey Deposition at 307.

Dempsey claims that one of the officers deliberately stepped on his hand while he was on the ground; for their part, each officer involved in this incident denies the charge. It is also a fact, however, that plaintiff did not seek, or require, medical treatment after this incident.

The officers then handcuffed the plaintiffs' wrists behind their backs while they conducted a pat-down search of plaintiffs. The officers claim that plaintiffs were

handcuffed only a minute or two, until it was determined that plaintiffs were unarmed. The plaintiffs allege that they were handcuffed for approximately ten minutes. In any event, it seems clear that the officers uncuffed the two men upon finding no weapons on them.

Sergeant William LaRonde, another member of the Brighton police force, arrived as the plaintiffs were being handcuffed. Sergeant LaRonde ordered Officer Mellini to take Curenton to the Monroe Savings Bank for a show-up identification. LaRonde gave this order based on information he received from a police investigator at the bank that a blue compact car, driven by a white man, may have been involved and based on his belief that Curenton matched the general description of the bank robber. Deposition of William LaRonde, November 27, 1989, at 645. A witness told the investigator that she saw a blue compact car, driven by a white man, speed away from the bank's vicinity immediately after the robbery.[1]

At Sergeant LaRonde's direction, Officer Mellini placed Curenton in a police cruiser and took him to the bank for a show-up identification. It is unclear whether the officers told Dempsey that he was free to leave at this time. In any event, Dempsey remained at the stop site to wait for his friend. Curenton was not taken to the bank in handcuffs. Curenton Deposition at 30; Hickey Deposition at 792. In fact, he was completely cooperative with the police. At the bank, eyewitnesses advised Mellini that Curenton was not the robber.

Mellini then returned Curenton to the point where the stop occurred. Dempsey was waiting with several officers. The officers claim that they apologized, and that Dempsey shrugged the whole thing off, joking that he had received harsher treatment from his mother. Mellini Deposition at 582, 587–88. Plaintiffs now deny this. Dempsey Deposition at 308, 316–18. In the end, plaintiffs drove off to work.

It is undisputed that the entire incident lasted approximately twenty minutes. It is similarly undisputed that at no time did the officers tell plaintiffs that they were under arrest or give any *Miranda* warnings. It also appears undisputed that plaintiffs were not physically injured in any way. No medical treatment was requested or sought by plaintiffs. Finally, though a television news crew with a camera appeared briefly on the scene, it is uncertain whether it shot any footage. If it did, any resulting film was apparently never aired. It is undisputed that no one who personally knew either of the plaintiffs witnessed this incident.

About two months later, Franklin Charles Leonard confessed to the Monroe Savings Bank robbery. He is now in jail.

### B. *The Lawsuit*

Plaintiff Dempsey initiated this action on July 7, 1988, claiming violations of his Constitutional rights by the defendants, the Town of Brighton, its chief of police and certain of the Town's police officers. Plaintiff Curenton commenced a parallel action on August 31, 1988. By order dated January 11, 1989, this court consolidated these actions.

Plaintiffs claim that the individual police defendants violated their civil rights by mistakenly subjecting them to a full arrest without underlying probable cause and by employing excessive force. Plaintiffs also claim that their civil rights were violated by the town, its police department and its police chief, in that these parties engaged in a policy of failing to train or supervise the Brighton police officers involved in the incident, which failure resulted in discrimination against plaintiffs on the basis of race. Defendants deny all this, and claim that the incident was merely an investigative detention made upon the appropriate level of reasonable suspicion.

Plaintiffs move for partial summary judgment, praying in essence that I find that this incident was an arrest, and that the police must consequently demonstrate the higher standard of probable cause to justify the seizure. Defendants cross-move

---

**1.** However, Officer Sleep did not know about the blue "get-away" car when he stopped plaintiffs. This information had not yet been broadcast over the police radio.

for partial summary judgment on the issues of negligent training and supervision.

## II. DISCUSSION

### A. *Summary Judgment: The Legal Standard*

The purpose of a summary judgment motion "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Federal Rule of Civil Procedure 56(c) requires the court to grant summary judgment if the evidence offered demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden of demonstrating the lack of any genuine issue of material fact rests on the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Ambiguities or inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the summary judgment motion. *Id.* However, a non-moving party may not rely on mere conclusory allegations but must set forth "concrete particulars" to defeat summary judgment. *Project Release v. Prevost,* 722 F.2d 960, 969 (2d Cir.1983).

It is well settled that "summary judgment may be rendered in favor of the opposing party even though he has made no formal cross-motion under Rule 56." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2720, pp. 29–30 (2d ed. 1983). *See also Lowenschuss v. Kane,* 520 F.2d 255, 261 (2d Cir.1975) (*sua sponte* award of summary judgment in favor of non-moving party appropriate); *Local 33, Intl. Hod Carriers Bldg. & Common Laborers' Union of America v. Mason Tenders Dist. Council of Greater New York,* 291 F.2d 496, 505 (2d Cir.1961) ("[I]t is most desirable that the court cut through mere outworn procedural niceties and make the same decision as would have been made had defendant made a cross-motion for summary judgment.")

A motion for summary judgment searches the record. *American Camping Ass'n, Inc. v. Whalen,* 554 F.Supp. 396, 399 (S.D.N.Y.1983); *McGovern v. Blaha,* 496 F.Supp. 964, 965 (W.D.N.Y.1980); *In re AP Industries, Inc.,* 117 B.R. 789, 796 (Bankr. S.D.N.Y.1990). If undisputed facts are found which, when applied to the law, indicate that judgment against the moving party is appropriate, Rule 56(c) will operate to grant summary judgment in favor of the non-moving party. *See Project Release v. Prevost,* 722 F.2d 960, 969 (2d Cir.1983) (a district judge may grant summary judgment to a nonmoving party, if no genuine issues of material fact have been shown.) "The making of a motion for summary judgment exposes the moving party to the risk that summary judgment will be granted against him, if the submissions make clear that there is 'no genuine issue as to any material fact....'" *Siderius, Inc. v. M.V. "Ida Prima",* 613 F.Supp. 916, 923 (S.D.N.Y.1985).

■ The practice of allowing summary judgment to be entered for the non-moving party in the absence of a formal cross-motion is in keeping with the objective of Rule 56 to expedite the disposition of cases. 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2720, p. 33 (2d ed. 1983). It is also in keeping with the mandate of Rule 54(c) requiring the court to grant the relief to which a party is entitled "even if the party has not demanded such relief in his pleadings." *Id.*

■ A district court also possesses the power to grant summary judgment *sua sponte* when neither party has moved for such relief. *Celotex Corp. v. Catrett,* 477 U.S. at 326, 106 S.Ct. at 2554; 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, at 27–29. In *Celotex,* 477 U.S. at 326, 106 S.Ct. at 2554, Chief Justice Rehnquist stated that "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence." The Second Circuit has said that "[a] court may grant summary judgment *sua sponte* when it is clear that a case does not present an issue

of material fact." *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir.1983).

Applying these principles in the instant case, I conclude that the undisputed material facts mandate the entry of summary judgment for defendants on plaintiffs' federal civil rights claims. The parties have been given ample opportunity to discover and present evidence designed either to support or refute the respective requests for summary judgment.[2] Despite extensive discovery and nearly one thousand pages of deposition testimony, memoranda and pleadings submitted by plaintiffs' counsel, plaintiffs have failed to raise a genuine issue as to any material fact.[3]

Moreover, plaintiffs were certainly on notice that they had to come forward with all of their evidence as to the issues concerning false arrest and excessive force. Plaintiffs were the ones moving for summary judgment on these issues. In their view, the undisputed facts were such that the Court should rule as a matter of law that the confrontation between plaintiffs and the police was tantamount to an arrest and therefore it could only be justified if there was probable cause. Because of plaintiffs' motions, I have searched the record and, based on the undisputed material facts, I conclude that the seizure was reasonable under the Fourth Amendment as an investigatory stop. Just because I disagree with plaintiffs' legal conclusion from the undisputed facts does not mean that I am precluded from granting summary judgment against the moving party on this issue. The record indicates that all the facts necessary for the disposition of this case are beyond dispute. No further refinement of the factual record or legal arguments could serve to alter the Court's conclusion that plaintiffs are not entitled to prevail on this complaint.

### B. The Police Acted Reasonably In Stopping Plaintiffs Dempsey and Curenton

■ The principal issue framed by the parties is whether the stopping of Dempsey and Curenton was an investigatory stop or an arrest. Plaintiffs claim that as a matter of law the stopping and detention was tantamount to an arrest. In plaintiffs' view, because there was an absence of probable cause to support the arrest, they are entitled to a finding in their favor as to liability. Defendants contend that the contact between plaintiffs and the police was not an arrest but merely an investigatory stop justified by the peculiar circumstances of the case.

Because this dispute arises by means of cross-motions for partial summary judgment, the court must also consider carefully whether these issues can be resolved by the court as a matter of law or whether they should be left for the jury. Plaintiffs claim that their view of the case warrants a finding as a matter of law that the confrontation was an arrest requiring probable cause. The undisputed material facts, however, lead to a different conclusion.

As unfortunate as the events of June 12, 1987 may have been to plaintiffs, nevertheless, I believe that as a matter of law the police conduct here was reasonable and proper. In my view, the detention of plaintiffs was an investigatory stop based on articulable facts and, as a matter of law, was reasonable under Fourth Amendment standards.

The Fourth Amendment guarantees citizens the right to be free from "unreasonable" searches and seizures. This case must, of course, be viewed in the context of the Fourth Amendment. Accordingly, the Court must determine whether the stopping of Dempsey's vehicle by the po-

---

**2.** In fact, discovery in this matter has been exhaustive. Plaintiff Dempsey submitted five sets of interrogatories, three notices to admit, and has deposed fourteen individuals. Additionally, over the course of this litigation, plaintiffs' counsel has submitted numerous repetitive and conclusory affidavits concerning his legal and factual contentions. In particular, plaintiffs' counsel filed three supplemental affidavits in support of plaintiffs' motion for partial summa-

ry judgment and in opposition to defendants' cross-motion.

**3.** In fact, plaintiff Curenton's counsel acknowledges that there is no genuine issue of fact concerning the events of June 12, 1987. Affidavit in Response to Defendants' Motion For Summary Judgment, p. 2, ¶ 5.

lice, the detention of the two men for approximately twenty minutes and the transportation of Curenton to the bank constituted an unreasonable seizure.

It is clear that Curenton and Dempsey were not in fact formally arrested. They were not taken to the station house, booked and charged with a crime. Plaintiffs were free to go after the questioning and show-up had achieved their purpose. It is also clear, however, that the police "seized" them as that term is understood under the Fourth Amendment. " '[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.' " *Michigan v. Summers*, 452 U.S. 692, 696, n. 5, 101 S.Ct. 2587, 2591, n. 5, 69 L.Ed.2d 340 (1981) (citing *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968)). But this does not end the inquiry, rather it is the place to begin.

The question, therefore, is actually not whether Dempsey and Curenton were under arrest, it is whether their admitted seizure by the police was reasonable under the circumstances.

Analysis of this issue must begin with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Supreme Court's landmark decision in *Terry* recognized that a police officer has the right to stop and detain citizens if the officer's action was reasonable. The police must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. This is not a subjective standard but an objective one.

In evaluating whether the seizure was reasonable under the Fourth Amendment, there is a two-part inquiry. First, the court must determine whether the officer's action was justified at its inception and, second, whether the action was reasonably related "in scope" to the circumstances which justified the interference in the first place. *Id.* at 20, 88 S.Ct. at 1879; *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir.1990).

*Terry* created an exception to the general rule that under the Fourth Amendment a seizure of a person is invalid unless justified by probable cause. As the Supreme Court noted in *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983), under *Terry*, "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime."

*Terry* involved a brief encounter on the street between a police officer and a suspect. It is clear, however, that investigatory stops need not be so fleeting. *See United States v. Sharpe*, 470 U.S. 675, 682–86, 105 S.Ct. 1568, 1573–75, 84 L.Ed.2d 605 (1985) (twenty minute investigative detention without interrogation was reasonable). Moreover, the "scope" of the intrusion that is permitted "will vary to some extent with the particular facts and circumstances of each case." *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325. In *Royer*, the Supreme Court summarized the rule concerning the length of the detention.

[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

460 U.S. at 500, 103 S.Ct. at 1325.

Two recent Supreme Court cases, *United States v. Sharpe, supra,* and *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), have further clarified what is permitted during an investigatory stop.

In *Sharpe*, the Court made it clear that the length of the detention alone does not transform an investigatory stop into an arrest. 470 U.S. at 685–86, 105 S.Ct. at 1575; *see United States v. Place*, 462 U.S. 696, 709, n. 10, 103 S.Ct. 2637, 2645–46, n. 10, 77 L.Ed.2d 110 (1983). The Supreme Court stated:

If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under

certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* ...

*Sharpe*, 470 U.S. at 685–86, 105 S.Ct. at 1575 (quoting *Michigan v. Summers*, 452 U.S. 692, 700, n. 12, 101 S.Ct. 2587, 2593, n. 12, 69 L.Ed.2d 340 (1981)).

In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court established the parameters by which all § 1983 claims involving excessive force during the course of an arrest or an investigatory stop are to be measured. The Court rejected the "substantive due process" analysis of *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Instead, the Court held in *Graham* that any analysis concerning whether the force used was excessive must begin with traditional Fourth Amendment principles. 109 S.Ct. at 1870. The Supreme Court concluded that "*all* [§ 1983] claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 1871 (emphasis in original).

Accordingly, the reasonableness of the force used must be balanced against the circumstances of the case. Whether the force used to effect a particular seizure is "reasonable" "requires a careful balancing of ' "the nature and quality of the intrusion on the individual's Fourth Amendment interests" ' against the countervailing government interest at stake." *Graham*, 109 S.Ct. at 1871 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)).

The reasonableness standard employed in such cases is an objective one and is made without reference to the officer's underlying intent or motivation. In other words, this standard must be judged from the perspective of a reasonable officer on the scene, "rather than with a 20/20 vision of hindsight." *Graham*, 109 S.Ct. at 1872. The Supreme Court also noted that "[t]he

calculus of reasonableness must embody an allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

■ Displaying a weapon relates to the amount of force that may be reasonably used to effect the stop. The fact that officers unholstered their weapons in effecting a *Terry* stop does not automatically elevate the stop into an arrest. *United States v. Harley*, 682 F.2d 398, 401 (2d Cir.1982); *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987) (no arrest when defendants "forced from their car and made to lie down on wet pavement at gunpoint"); *United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir.1983) (no arrest when suspect removed from car at gunpoint and ordered to "prone out" on ground).

■ Whether it is reasonable to display a weapon depends on the crime being investigated, the place and time of the stop as well as the reaction of the suspect. *Id.* at 402. As the Second Circuit noted in *Harley*, "[w]hat might be unreasonable when an officer merely suspects that a minor offense has been committed is not unreasonable when, as here, officers have reason to fear that a suspected criminal is armed." *Id.* If there is sufficient reasonable suspicion to justify an investigatory stop, reasonable force may be used to effect that stop. *Id.* at 402.

■ Likewise, the handcuffing of a suspect does not convert a stop into an arrest. *See, e.g., United States v. Glenna*, 878 F.2d 967, 972 (7th Cir.1989); *United States v. Bautista*, 684 F.2d 1286, 1289–90 (9th Cir.1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446, 447 (1983). In addition, a person is not under arrest simply because he is placed in a police patrol car. *See, e.g., United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.1988).

Applying the principles established in the cases cited above, it is my view that under Fourth Amendment standards, the

stopping and seizure of Dempsey and Curenton for a period of about twenty minutes while Curenton was taken to the bank for viewing was reasonable.

### 1. The Stop

■ Under the first part of the analysis, I must determine if the initial stop was reasonable and justified. On the facts presented here, I find as a matter of law that the stop was reasonable. The officers were investigating a serious crime—armed bank robbery—that had occurred less than an hour earlier, about four blocks from where plaintiffs were initially spotted. The fact that a known crime had occurred is very important and distinguishes this case from others where the police had no independent evidence that a crime had occurred before they confronted a suspect.

The contact took place just a few blocks from the crime scene in the direction that the robber reportedly had fled. The undisputed evidence is that a black man robbed the bank. Plaintiffs' papers suggest some type of racial animus was present in singling out Curenton because he was black. I fail to see how race was a factor here. The police *knew* that the perpetrator was black. It would have been folly for them to look for anyone other than a person fitting the general description of the robber. If there had been no description of the robber as black, it might well have been impermissible to single out black men but that is certainly not what occurred in this case.

Based on the descriptions of the robbery suspect given over the police radio, it was reasonable for Officer Sleep to believe that he had a basis to stop and investigate Curenton. Radio broadcasts after a robbery are not always models of precision and clarity. In the often frenzied and fast developing circumstances immediately following a robbery, police officers often must rely upon sketchy information in an attempt to apprehend the perpetrators.

The description broadcast over the police radio described the robber as a young black male, about six feet tall with a slim build wearing a long-sleeved purple shirt, or possibly a blue jacket, a hat and sunglasses.

The suspect was also described as having threatened a gun, although one was not displayed. Officer Sleep saw Curenton and believed he matched the general description of the robber. He described Curenton as a black male, about six feet tall, wearing blue clothing and sunglasses. He also saw that Curenton was carrying a bag. Sleep's interest was further aroused when he saw Curenton jump into a waiting car. It is also important to keep in mind that all of this transpired within four tenths of a mile from the bank.

Sleep made a decision to stop Curenton and investigate further, but only after first confirming the suspect's description with the dispatcher. Considering all the information available to Sleep, his decision to stop the plaintiffs and investigate was justified. The only other choice that Sleep had at the moment was simply to let the car drive away and perhaps be lost forever.

■ Having made the decision to stop Dempsey's vehicle, Sleep then had two choices: He could saunter up to the car window and confront the two unknown men or he could take reasonable precautions for his safety and the safety of bystanders before he investigated further. I cannot fault Sleep under the facts here for choosing the latter course. Sleep had articulable facts amounting to a suspicion that one of these men had just committed armed robbery. Based on these facts, it was not unreasonable for Sleep to suspect that the other man was a cohort, driving the get away vehicle. In my view, it would have been unreasonable for Sleep not to take precautions to protect himself and bystanders. *See Harley,* 682 F.2d at 402 ("In weighing the conduct of the officers involved, we must give due consideration to their experienced judgment.")

Further, the Brighton Police Department's felony-stop procedures are designed to guard against the special dangers faced by police when attempting to approach suspects in automobiles. *Terry* recognized that it is *unreasonable* for courts to require police officers to take "unnecessary risks in the performance of their duties." *Id.* at 23, 88 S.Ct. at 1881. Cases are

legion that support that principle. *See Harley*, 682 F.2d at 402 ("We would be heartless if we did not share the officers' concern for their own safety.... [W]e cannot impose on law enforcement personnel the hobson's choice of keeping their guns holstered when to do so 'increases the risk that they will be shot.' ")

The Second Circuit recently noted in *Alexander* that it was not unreasonable for investigating officers to protect themselves by unholstering their guns especially in a car-stop situation which is "especially hazardous and supports the need for added safeguards." *Alexander*, 907 F.2d at 273. In *Alexander*, the officers stopped the suspect's car, approached him with guns drawn, removed him from the car and frisked him. The Court of Appeals stated:

> There are no hard and fast rules for evaluating the conduct of law enforcement officers conducting investigative stops. [Citations omitted.] A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists. [Citations omitted.] The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Citation omitted.]

*Alexander*, 907 F.2d at 272.

In the case before me, I do not find that the amount of force used by these officers to freeze the situation upon their first contact with plaintiffs was excessive as a matter of law.[4]

### 2. The Show-up

■ The next issue is whether the police were reasonable in transporting Curenton to the bank and in detaining Dempsey during that process. The parties agree that the entire stop, detention and show-up took no more than twenty minutes.

Based on the circumstances facing the officers at the time *and* based on 20/20 hindsight, the officers' transportation of Curenton to the scene is precisely what should have been done under the circumstances. The quickest, least intrusive way of determining if Curenton was in fact the robber was to take him to the bank for a viewing by the tellers who witnessed the robbery. Courts have time and again approved on-the-scene showups, occurring reasonably soon after the crime, as one of the best ways not only to catch the criminal but also to exonerate the innocent. *People v. Hicks*, 68 N.Y.2d 234, 242–43, 508 N.Y. S.2d 163, 500 N.E.2d 861 (1986); *United States v. Bennefield*, 741 F.Supp. 1002, 1006 (D.Mass.1990) ("[w]here the innocent may have been mistakenly apprehended, prompt identification allows the police to realize their error and to continue their search while the criminal is still within easy reach.").

Within a matter of minutes, Curenton was taken a few blocks back to the bank, viewed by the victim teller and exonerated. The justification for taking Curenton back to the bank is strengthened by the fact that Sergeant LaRonde, who ordered that Curenton be transported to the bank for the show-up, was aware that a blue "get-away" car may have been involved. LaRonde

---

**4.** Plaintiff Dempsey also claims that the police used excessive force when one of the officers allegedly stepped on his hand as the police were attempting to handcuff him. The officers deny intentionally stepping on Dempsey's hand. At best it was inadvertent.

Accepting plaintiff's facts as true, this can hardly be called excessive force. " 'Not every push or shove, even if it may later seem unnecessary, in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

This alleged use of excessive force took place while officers were attempting to handcuff Dempsey, who at that point was yelling and may have been thrashing about. The police also suspected that he might be armed. Since the officers reasonably suspected that a gun was involved in the crime, they were entitled to use reasonable force to carry out their lawful duties to prevent a dangerous confrontation and to investigate possible criminality.

Deposition at 645. Sergeant LaRonde ordered the show-up based on his belief that Curenton matched the general description of the bank robber and his knowledge that a blue compact car, driven by a white man, may have been involved in the robbery. LaRonde Deposition at 645.

Curenton was not taken to the bank in handcuffs and, in fact, accompanied the officer without objection. He was completely cooperative with the police. Immediately after the show-up exonerated Curenton, the police returned him to Dempsey's vehicle and both men departed for work.

The police acted reasonably here. The scope of the detention was limited. Curenton was not interrogated for long periods of time; he was given a prompt explanation as to why he was taken to the bank and he was never taken to a police station or other location for questioning.

*People v. Hicks, supra,* decided by New York's highest court about a year before the stop of Dempsey and Curenton, is squarely on point. In that case, the New York Court of Appeals conceded that probable cause was lacking to arrest Hicks. But, based on the description of the robber, the court held that it was reasonable to stop the defendant and return him to the scene for viewing by the robbery victims. *Hicks* discussed the same issue presented here, that is, what are the bounds of a "prolonged" *Terry* stop. *Hicks,* 68 N.Y.2d at 241, 508 N.Y.S.2d 163, 500 N.E.2d 861. The Court of Appeals upheld the show-up procedure not only because its purpose was to confirm or dispel reasonable suspicion quickly, but also because the authorities knew that a crime had actually been committed, the period of detention was brief, the crime scene to which defendant was taken was very close, and eye witnesses were there. *Hicks,* 68 N.Y.2d at 243, 508 N.Y.S.2d 163, 500 N.E.2d 861.

The court in *Hicks* relied principally on the guide posts set up by the Supreme Court in *Sharpe* and held that the transportation of the defendant was reasonable. The language from *Hicks,* 68 N.Y.2d at 242, 508 N.Y.S.2d 163, 500 N.E.2d 861 is instructive:

> Nor does the fact that the detention included transporting defendant to the crime scene render the seizure unreasonable. There were witnesses within a quarter mile of the place of inquiry—approximately one minute away by car—who had just seen the perpetrators and would either identify defendant (in which event he would be arrested) or not identify him (in which event he would be released). A speedy on-the-scene viewing thus was a valuable to law enforcement authorities and to defendant and was appropriate here.

The factors in *Hicks* that made the show-up reasonable in that case are also present here. The police action was aimed at confirming or dispelling reasonable suspicion quickly. The Brighton Police officers knew that the crime of armed robbery had actually been committed; the total period of detention was about 20 minutes, the crime scene to which Curenton was taken was very close, and eyewitnesses were there; and finally there is no proof of significantly less intrusive means available to accomplish the same purpose.

Finally, I note that neither plaintiff appears to have alleged any damage—aside from the loss of a few minutes—other than injury to his dignity. Under the circumstances, it appears then that the actions taken by the officers were successful both in minimizing danger to themselves and harm to plaintiffs. Their conduct also resulted in the prompt release and exoneration of Curenton.

### C. *Qualified Immunity*

I believe that under applicable precedent, the Brighton Police were reasonable in stopping plaintiff's vehicle and in transporting Curenton a few blocks to the bank for viewing by bank employees. In addition, I believe that summary judgment for the individual officers is also appropriate because on these undisputed facts the officers had qualified immunity from any civil actions relating to their conduct.

Questions of immunity should be resolved at the earliest possible stage of

the litigation so that an officer who is immune from suit will not have to proceed through a lengthy trial to establish that fact. Qualified immunity is not really an affirmative defense but is more in the nature of a bar to suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985). "[T]he defense has been construed as an immunity from suit not a mere defense to liability." *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir.1990).

■■■ If there are no material disputed facts to be resolved, then the decision concerning qualified immunity is a question of law for the court to decide. *Finnegan v. Fountain*, 915 F.2d 817, 821 (2d Cir.1990).

■■■ The standard for determining qualified immunity in federal court, "was designed to facilitate resolution of the defense on a motion for summary judgment." *Warren*, 906 F.2d at 74. In *Warren*, the Second Circuit stated that the "better rule" is for the Court to decide the issue of qualified immunity as a matter of law, "preferably on a pretrial motion for summary judgment." 906 F.2d at 76. *See also Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (the qualified immunity test "permits the resolution of many insubstantial claims on summary judgment").

The standard for determining whether qualified immunity applies is now well established. In *Warren*, a recent case concerning a § 1983 suit for false arrest, the Second Circuit summarized the applicable principles:

> Government officials performing discretionary functions are shielded from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [102 S.Ct. 2727, 2738, 73 L.Ed.2d 396] (1982). Even where the law is "clearly established" and the scope of an official's permissible conduct is "clearly defined," the qualified immunity defense also protects an official if it was "objectively reasonable" for him at the time of the challenged action to believe his acts were

lawful. *Anderson v. Creighton*, 483 U.S. 635, 641 [107 S.Ct. 3034, 3040, 97 L.Ed.2d 523] (1987) (explaining *Harlow v. Fitzgerald*, 457 U.S. at 800 [102 S.Ct. at 2727]); *Robison v. Via*, 821 F.2d 913, 920–21 (2d Cir.1987) (acknowledging three avenues of relief).

906 F.2d at 74.

A grant of summary judgment is appropriate if the defendant official "adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robison*, 821 F.2d at 921. It is also well established that an officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences show either (a) that it was objectively reasonable for the officer to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether there was probable cause or, in this case, whether there was a reasonable suspicion under *Terry v. Ohio* standards. *Robison*, 821 F.2d at 921.

In this case, I believe that the officers acted "reasonably" under Fourth Amendment standards in stopping the plaintiffs to investigate the robbery. But, even if I had determined that there was *not* a sufficient basis for the stop or that the stop was too long, I still believe that the officers have qualified immunity because it was objectively reasonable for Officer Sleep to believe that his actions were lawful. *Robison* made it clear that if officers of reasonable competence disagree as to the propriety of the stop, then an officer who made the decision to stop would be protected. 821 F.2d at 921.

It is, of course, a well established right that a citizen cannot be arbitrarily stopped by the police without some legitimate basis. But it has been recognized, at least since the Supreme Court's decision in *Terry v. Ohio*, that the police may detain suspects, even though there is no probable cause for

arrest, as long as the officer has a reasonable suspicion based on articulable facts that criminal activity is involved.

In my view, it was objectively reasonable for Officer Sleep to believe that under established legal principles he could stop the plaintiffs to investigate the bank robbery. As discussed above, the description of the robber and the description of Curenton were similar enough to justify a reasonable officer in stopping and detaining the plaintiffs. Frankly, based on what had occurred and based on the information that Sleep had, it may well have been a dereliction of duty for him to have simply let Curenton drive away.

It was objectively reasonable for the police to believe that a short detention to investigate a serious crime was permissible. In *People v. Hicks, supra,* the New York Court of Appeals, one year before this incident, specifically authorized such a detention for the purpose of a viewing by the victim. It is hard to imagine how the officers could believe their conduct to have been illegal in light of the *Hicks* case and in light of the Supreme Court's decision in *Terry.* Both cases would seem to authorize the very police action that occurred here.

The fact that other competent officers might have acted differently is not controlling. Under *Robison,* if reasonably competent officers could differ on the approach, an officer should not be penalized with potential civil liability for choosing one of the possible modes of action. Accordingly, summary judgment must be granted in favor of the defendant officers of the Brighton Police Department.

### D. *Municipal Liability Under Section 1983*

■ Neither a municipality nor its supervisory police personnel may be held vicariously liable for the actions of a policeman allegedly constituting a § 1983 violation, unless the injured plaintiff can show the existence of an official policy or custom that the municipality sanctioned or ordered. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Pembauer v. City of Cincinatti,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Fiacco v. City of Rensselaer,* 783 F.2d 319 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987).

Plaintiff must also show a "causal link" between the alleged custom or policy and the alleged § 1983 violation and concomitant harm. In short, "a municipality can be liable under § 1983 only where its policies are the 'moving force behind the violation.'" *City of Canton,* 109 S.Ct. at 1205 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38). Vicarious or *respondeat superior* liability will not attach under § 1983. *Id.* 109 S.Ct. at 1203.

Moreover, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a [municipal] 'policy or custom' that is actionable under § 1983." *Id.* at 1205. The Supreme Court has stated that it will not suffice "to prove that an injury or accident could have been avoided if an officer had had better or more training.... Such a claim could be made about almost any encounter resulting in injury." *Id.* at 1206.

Plaintiffs have alleged a policy here, but only in very conclusory terms. They appear to argue that insufficient training and supervision has caused the Town of Brighton's police department to harass black persons, because of their race, in violation of their civil rights.

Aside from the fact that plaintiff Dempsey (who is white) most likely has no cause of action in this regard, plaintiffs have not pointed to sufficient evidence giving rise to an inference of policy. One statement by Chief Shaw which is singled out by plaintiffs—that suspects apprehended by Brighton police are not "under arrest" until they are so informed—does not represent a policy of the Town, nor does it appear to be a

prescription for constitutional violations.[5]

In *Vippolis v. Village of Haverstraw*, 768 F.2d 40 (2d Cir.1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987), the Second Circuit reversed a district court for failing to dismiss a complaint arising out of a false arrest incident. The plaintiff in *Vippolis* made a showing that the defendant municipality hired the offending officer knowing his training to be insufficient—but nonetheless was reversed because he made no showing that such deficient training was a general municipal policy:

> For a victim of police brutality to establish the requisite causal connection between his injuries and a municipal policy of inadequate training, he must make some showing that the specific deficiencies in the training given police officers led the misbehaving officer to engage in the alleged misconduct. The record contains no evidence concerning the police procedures covered by the training program to show, for example, that the program would have instructed [the officer] how to make arrests and how to subdue ·an abusive suspect.... Under these circumstances, a jury could not rationally find that the municipal defendants' failure [caused plaintiff's] injuries.

768 F.2d at 44–45.

*Powell v. Gardner*, 891 F.2d 1039, 1045 (2d Cir.1989), presents a similar case. There, "a directed verdict in favor of the County on [the § 1983 claim] was proper ... because the record is devoid of evidence ... that [plaintiff] was injured as the result of a municipal custom or policy, and because we are unpersuaded that [plaintiff] was unfairly denied the opportunity to present such evidence."

I note that in the case at bar, as far as plaintiff's opportunity to present such policy evidence goes, plaintiff has submitted close to one thousand pages of depositions, memoranda and pleadings. Despite the voluminous submission, plaintiffs have failed to furnish any evidence of a municipal policy or custom. *See Walden v. Wishengrad*, 745 F.2d 149, 153 (2d Cir.1984) ("[since plaintiff] has not pleaded or shown by affidavit any facts which indicate that her allegedly unconstitutional arrest was the product of official government policy.... the district court properly granted summary judgment"); *Rodriguez v. Avita*, 871 F.2d 552, 554 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989) ("In 'cases invoking 42 U.S.C. § 1983 we consistently require the claimant to state specific facts, not merely conclusory allegations.' ")

Finally, the only specific act illustrating the policy complained of by plaintiffs is the incident itself. This is not enough. A "single incident alleged in a complaint ... especially if it involved only actors below the policy-making level, generally will not suffice to raise an inference of a custom or policy." *Powell*, 891 F.2d at 1045; *Fiacco*, 783 F.2d at 328. *See also Rodriguez v. Avita*, 871 F.2d at 555 (claim of inadequate police training insufficient because the pleading "does no more than describe a single incident of arguably excessive force applied by one officer—a description decked out with general claims of inadequate training and gross negligence, all concededly stemming from the single incident and nowhere else.")

Plaintiffs have failed to produce any evidence as to deficient training and supervision except this single incident. Therefore, defendants' cross-motion for summary judgment is granted. Plaintiff's claims against the Town of Brighton and the Chief of Police, Eugene Shaw, are dismissed.

---

5. In support of their motion for summary judgment, the municipal defendants submitted the affidavits of officers involved in this incident, as well as Thomas M. Voelkl, a lieutenant responsible for staff services, including coordination of officer training. These affidavits set forth at length the Brighton Police Department's extensive training program, its procedures for responding to a bank robbery and its policies regarding felony vehicle pull-overs and approaches, arrests and detention, and the use of firearms. Plaintiffs have not proffered any evidence to dispute the defendants' substantial evidence that its officers are properly trained and supervised. Nor have they specifically identified or offered proof of a custom or policy which authorizes police officers to harass blacks or to use excessive force in confrontations with citizens, particularly blacks.

### E. *Pendent State Claims* ·

█ Plaintiffs also seek compensatory and punitive damages based on state law claims of assault, emotional distress, false arrest and detention, and malicious prosecution.[6] Having determined that plaintiffs' federal claims must be dismissed, and there being no diversity of citizenship between the parties, the court declines to take jurisdiction of the state law claims. "It is well settled that 'if the federal claims are dismissed before trial ... the state claims should be dismissed as well.'" *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 104 (2d Cir.1990), citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). This decision is in keeping with the principle that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Robison v. Via*, 821 F.2d at 925. Accordingly, the plaintiffs' state law claims are dismissed.

### III. CONCLUSION

Plaintiffs' motion for partial summary judgment as to the issues of false arrest and excessive force is denied. Defendants' cross-motion for partial summary judgment on the issues of negligent training and supervision is granted. With regard to the plaintiffs' remaining federal claims, the Court grants summary judgment in favor of defendants dismissing plaintiffs' federal claims and pendent state claims. Plaintiffs' action against all defendants is dismissed in its entirety. The above shall be entered in both Civ. 88–726L and Civ. 88–930L.

IT IS SO ORDERED.

---

**6.** In a § 1983 action for malicious prosecution, as well as in a New York state tort action for malicious prosecution, the plaintiffs in order to prevail must establish four elements: "(1) that the defendants either commenced or continued a criminal proceeding against them; (2) the proceeding terminated in their favor; (3) there was no probable cause for the criminal proceed- ing; and (4) the criminal proceeding was initiated out of actual malice." *Angel v. Kasson,* 581 F.Supp. 170, 175 n. 9 (N.D.N.Y.1983) (citing *Singleton v. City of New York,* 632 F.2d 185, 195 (2d Cir.1980)). Since no criminal proceeding was initiated or continued against plaintiffs, this claim must fail.