**UNITED STATES of America, Appellee,**

v.

**Mehdi TEHRANI, Defendant,**

**Amir Alaei, Defendant–Appellant.**

No. 552, Docket 94–1234.

United States Court of Appeals, Second Circuit.

Argued Dec. 19, 1994.

Decided Feb. 23, 1995.

Bradley S. Stetler, Stetler & Allen, Burlington, VT, for defendant-appellant.

Paul J. Van De Graaf, Asst. U.S. Atty. for D. Vt., Burlington, VT (Charles R. Tetzlaff, U.S. Atty., David V. Kirby, Chief, Criminal Div., on the brief), for appellee.

Before: MINER, ALTIMARI and CALABRESI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Amir Alaei appeals from a judgment of conviction entered in the United States District Court for the District of Vermont (Parker, C.J.), upon a plea of guilty to one count of aiding and abetting the possession of counterfeit access devices with

intent to defraud in violation of 18 U.S.C. § 1029(a)(3). After Alaei and a co-defendant were detained in the Burlington, Vermont airport on suspicion that they had entered the country illegally, authorities discovered incriminating materials leading to the instant conviction. Alaei and his co-defendant moved to suppress the evidence on the ground that the initial stop, the subsequent detention and their arrests were illegal. The district court granted the motion to suppress as to a driver's license found in Alaei's pocket and certain statements made by the suspects but determined that all other evidence was admissible. 826 F.Supp. 789. Alaei appeals the partial denial of his motion to suppress. Finding no error by the district court, we affirm.

## BACKGROUND

Alaei was arrested, together with co-defendant Mehdi Tehrani, at the Burlington, Vermont International Airport on November 13, 1992 by United States Border Patrol Agent Paul Moran and Vermont State Trooper Paul Cucinelli. At about 10:30 a.m. Agent Moran noticed three men dressed in unusually expensive clothes enter the terminal from an entrance providing access to passengers arriving via ground transport. Aware that aliens were frequently apprehended at a nearby border crossing, and because of the men's behavior and appearance, Moran suspected the trio of having illegally entered the country from Canada.

Moran, who at some point enlisted Trooper Cucinelli's aid, observed the three as they separately walked through the airport. After some five minutes, the three regrouped to approach the Business Express ticket counter. Tehrani and Alaei checked luggage and then waited inside the terminal. Moran spoke with the Business Express ticket agent who told him that the three men had been in the terminal on previous occasions, and had made reservations, but had never bought a ticket. On that day, however, Tehrani had bought two one-way tickets to Las Vegas with a Visa credit card.

Alerted by the ticket agent who could see the men, Moran turned to see Tehrani leaving the building. Moran and Cucinelli followed Tehrani into the short-term parking area. About half-way across the lot, Tehrani noticed the two agents following him. Reversing direction, he walked toward Cucinelli and Moran, who introduced themselves. They inquired of Tehrani where he was from and asked that he identify himself. He responded "defensively," suggesting that he was being stopped because he was Iranian. He told the agents that they had no right to detain him and that he would sue them, and continued walking back toward the terminal. Although Moran and Cucinelli did not try to stop him, they accompanied him, continuing to ask questions.

Tehrani told them that he had walked from the Canadian border, which was some forty miles away. He also said, inconsistently, that he had entered the United States at Burlington. He denied travelling with anyone, refused to identify himself, and declined to produce identification. Moran advised him that he had an obligation to carry identification and to produce it upon a request from a Border Patrol Agent.

Cucinelli, meanwhile, asked no questions and stayed a short distance away. When Tehrani became upset, the state trooper attempted to calm him down and suggested that he accompany him to a state police department office inside the terminal. Upon reaching the small office, the two waited for Moran, who had left them at the terminal entrance in order to speak with Alaei, who had remained seated in the waiting area. It was about 10:40 a.m. The third individual disappeared and is not part of this case.

Alaei, meanwhile, told Moran that he was en route to Las Vegas, which corroborated what the airline representative had said to Moran. At Moran's request, Alaei produced an evidently valid Canadian citizen card. He was unable, however, to tell the agent how he had entered the country. He said that he had been travelling in a jeep with Tehrani, who had denied having travelling companions. Alaei soon acceded to Moran's request to accompany him to the state trooper's office.

Back at the office, Moran informed Tehrani and Alaei that he suspected that they were

illegal aliens. He told them that he intended to verify their identities, their immigration status, and their documents. He also informed them that they would not make their scheduled 11:10 a.m. flight. After asking Alaei a few more questions about his employment, criminal history and travel plans, Moran began making phone calls to confirm the detainees' immigration status. Eventually, he learned that Alaei had been twice refused entry into the country. While Moran investigated the two, Cucinelli, unbeknownst to the detainees, went to the Business Express counter and told the airline to hold the men's luggage. He testified later that it was his practice to delay baggage belonging to individuals under investigation. He believed that detained travellers preferred to have their luggage with them when they eventually travelled.

After Cucinelli returned, Moran noticed Alaei dropping something to the floor. Moran picked up a Concordia University student identification card which Alaei had been attempting to kick away. The card bore the name "Franco Cantini." Moran noticed that Alaei had his hand inside the outer pocket of his jacket. Concerned for his safety, he grabbed Alaei's hand, yanking it out of the pocket. Alaei shoved the agent in return. Although Alaei's hand was empty, Moran retrieved from the pocket a torn driver's license also bearing the name "Franco Cantini." In response to Cucinelli's question, Alaei explained that identification in different names allowed students to take exams for others.

Moran then patted down both Tehrani and Alaei. The two conversed in a language which the agents neither understood nor recognized. During the interview, Tehrani, who had remained defensive, had received several phone calls, which he was permitted to conduct in the same language, on a cellular phone. After the patdown, Alaei, too, became somewhat defensive. Eventually, however, Tehrani became more cooperative and told the agents that he had crossed the border in Vermont in a Nissan and had told the border agents that he intended to go to Boston for a few days. Both Alaei and Tehrani admitted to lying about their real Las Vegas destination upon entering the United States.

At about 11:30 a.m., right after the men admitted to having misled border patrol agents at the point of entry, Tehrani and Alaei were administratively arrested. Moran told them that, by lying, they had violated the terms of their entry into the country and would face civil deportation proceedings. Shortly thereafter, their luggage was delivered to the office. Tehrani consented to a search of his luggage which revealed twenty counterfeit credit cards in the name "Franco Cantini." Tehrani expressed surprise.

Alaei filed a motion to suppress the physical evidence and statements obtained by the agents. After a hearing, the district court granted the motion to suppress Alaei's statements and the driver's license found in his jacket pocket but denied the rest of his motion which would have required, in relevant part, suppression of the student identification card in the name "Franco Cantini" which Alaei had attempted to discard in the police office. In a thorough and well-reasoned opinion, the court found that the encounters with the agents were consensual until the point when Tehrani and Alaei were separately asked to retire to the state police office. The court ruled that, although the men were then seized within the meaning of the Fourth Amendment, the investigative detentions were permissible because they were (1) supported by a reasonable articulable suspicion, and (2) as brief as possible given the purpose of the stop. The district court also held (1) that the detention of Tehrani's luggage, where the twenty credit cards were found, was permissible because the investigative detention of Tehrani was lawful and thus could not taint the seizure of his luggage, and (2) that Tehrani's consent to the search of his luggage was voluntarily given.

Subsequently, Alaei pleaded guilty, pursuant to a conditional agreement with the government, to one count of aiding and abetting the possession of unauthorized credit cards. The agreement allowed him to appeal the partial denial of his motion to suppress evidence. On appeal, Alaei asserts that the agents lacked reasonable suspicion to detain him when they escorted him to Cucinelli's

office. Alaei also maintains that he was subject to a *de facto* arrest during the approximately thirty minute period prior to the moment when he attempted to discard the student identification card. He therefore urges that the district court erred when it denied in part his motion to suppress because the searches and seizures were the result of the infringement of his rights under the Fourth Amendment.

## DISCUSSION

### A. Standard of Review

Whether a seizure occurred and, if so, whether it was justified by the requisite showing, are questions of law to be reviewed de novo. *See United States v. Glover,* 957 F.2d 1004, 1007 (2d Cir.1992) (citing *United States v. Springer,* 946 F.2d 1012, 1015 (2d Cir.1991)). At what point a permissible investigative detention ripens into an arrest is a question of fact, *see Posr v. Doherty,* 944 F.2d 91, 99 (2d Cir.1991), which we review for clear error, *see Glover,* 957 F.2d at 1007. In conducting our review, we must construe all evidence in the light most favorable to the government. *See id.*

### B. General Principles

As our cases make clear, there are three levels of interaction between agents of the government and private citizens. *See id.* at 1008; *United States v. Hooper,* 935 F.2d 484, 490 (2d Cir.), *cert. denied,* 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). Consensual encounters require no justification so "'long as the police do not convey a message that compliance with their requests is required.'" *Glover,* 957 F.2d at 1008 (quoting *Florida v. Bostick,* 501 U.S. 429, 435, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)). Investigative detentions, the second category, require "reasonable suspicion" to believe that criminal activity has occurred or is about to occur. *Glover,* 957 F.2d at 1008. Arrests, requiring a showing of probable cause, comprise the third type of encounter between citizens and government agents. *See id.*

It is the middle ground, limited investigative stops made pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, that concerns us here. These detentions, no matter how brief, *see United States v. Sugrim,* 732 F.2d 25, 28 (2d Cir.1984), must be founded upon "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884). The requisite level of suspicion is "'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Glover,* 957 F.2d at 1009 (quoting *United States v. Villegas,* 928 F.2d 512, 516 (2d Cir.) (quotation omitted), *cert. denied,* 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991)).

There is a legitimate governmental interest in preventing the illegal entry of aliens into the country. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 878–79, 95 S.Ct. 2574, 2578–79, 45 L.Ed.2d 607 (1975). The legitimacy of a detention by a border patrol depends upon "where it occurs and what its purpose is." *Sugrim,* 732 F.2d at 29. The test is an objective one. *See Glover,* 957 F.2d at 1010. The factors that permissibly contribute to reasonable suspicion include proximity to the border, the suspect's behavior and appearance, and the agent's experience in detecting illegal entry. *See Sugrim,* 732 F.2d at 30 (citing *Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. at 2581–82).

If an investigative detention is properly premised upon articulable suspicion, the next inquiry is whether its scope and duration are reasonable. The investigation must be as minimally intrusive as possible, bearing in mind the circumstances that gave rise to the suspicion. *See Glover,* 957 F.2d at 1011; *see also United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985); *United States v. Place,* 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). The length, *see, e.g., Sharpe,* 470 U.S. at 685–86, 105 S.Ct. at 1575, and conditions, *see, e.g., Florida v. Royer,* 460 U.S. 491, 502–03, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983) (plurality opinion), of the detention inform this determination. In addition, the availability of alternative forms of investigation bears upon the determination.

*See, e.g., Place,* 462 U.S. at 709, 103 S.Ct. at 2645.

### C. Whether Reasonable Suspicion Existed With Respect to Alaei

 Alaei does not challenge the district court's ruling that the encounter between the defendants and the officers was consensual until the points at which they were each asked to retire to the private office used by the state police. Instead, he argues that the agents lacked reasonable suspicion to believe, following the consensual encounter, that he—not Tehrani—was in the United States unlawfully. *See, e.g., Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (reasonable suspicion must be particularized).

There is no dispute that, as to Tehrani, articulable suspicion existed. Alaei, however, stood in a somewhat different position. He gave several answers that were consistent with what the ticket agent had told Moran; he unhesitatingly identified himself, producing a Canadian citizenship card; and he admitted that he was travelling with Tehrani. On the other hand, Alaei was unable to explain how or where he entered the country. And his apparently truthful answers were inconsistent with the answers of his known travelling companion. The question we must answer is whether, under these circumstances, reasonable suspicion existed with respect to Alaei.

Alaei argues that, because reasonable suspicion must be particularized, *see United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *Ybarra,* 444 U.S. at 91, 100 S.Ct. at 342, the district court erred in concluding that the investigative detention to which he was subject was constitutionally permissible. In *Ybarra,* the Court considered a case in which a reliable informant provided information about a bartender that led to the issuance of a search warrant covering the tavern and the bartender. 444 U.S. at 85, 100 S.Ct. at 339. In executing the warrant, the police patted down the customers in the bar, one of whom was carrying heroin. *See id.* at 88–89, 100 S.Ct. at 340–41. The Court held that the patdowns were unconstitutional because "a

person's mere propinquity to others independently suspected of criminal activity," created neither probable cause nor reasonable suspicion. *Id.* at 91, 100 S.Ct. at 342.

This Court has recently considered the circumstances under which reasonable suspicion created by one person can "taint" another individual. *See United States v. Jaramillo,* 25 F.3d 1146 (2d Cir.1994). In an instructive analysis of several lines of Fourth Amendment cases, we discerned a relationship between two factors: (1) the nature of the place in which the intrusion occurred, that is, public or private, and (2) whether the individual himself was behaving suspiciously or whether he was tainted by the behavior of another. *Id.* at 1151–53. The *Jaramillo* court distinguished the case before it, involving a defendant "stopped in a public place and who had no known connection with the only person whom the officers had articulable grounds to suspect of wrongdoing," from cases in which the circumstances gave rise to "sufficiently 'specific and articulable facts' to warrant the stop and patdown of an individual...." *Id.* at 1151.

Among the cases viewed by the court as distinguishable was *United States v. Patrick,* 899 F.2d 169 (2d Cir.1990). We there upheld the detention of a male defendant who crossed the border from Canada into New York at about the same time as a woman. *See id.* at 170. At the time, there were no other travellers present and both defendants told the same unusual story: they had accidentally crossed the border by bus and were simply returning to the United States. *Id.* at 171. When cocaine base was discovered in the woman's possession, the man was also arrested. *Id.* at 172. Relying on *Ybarra,* the district court suppressed statements made by the male defendant on the ground that "*the only link* between Patrick and the cocaine discovered in [the woman's] purse was Patrick's proximity to [her] when they crossed the border from Canada." 899 F.2d at 171 (emphasis added).

We reversed because the evidence demonstrated that the male traveller was not only in close proximity to the suspicious woman, but also that he acted in concert with her in transporting the narcotics. *Id.* at 172. The

evidence to which we referred was the defendant's entry into the immigration office at a time when no other people were there, and that both defendants told an unusual story in explaining their border crossing. *Id.* From this information we held that the border patrol agents reasonably suspected complicity.

There is present in this case a similar quantum of evidence. Alaei was the conceded travelling companion of a person whom the police reasonably suspected of illegally crossing the border. Tehrani, who refused to produce identification, first told Moran that he had walked to Burlington from Canada, a forty mile distance. He then told him he had entered the country at Burlington, which is possible only by air. Tehrani also denied having a travelling partner. Like Tehrani, Alaei could not say where he had entered this country. As in *Patrick*, the information that the agent had about the companion-defendant—(1) that he was travelling with a person who had refused to provide identification, (2) who had lied about how he entered the country, as well as (3) about the fact that he was not alone, and (4) who had been hostile during questioning, together with (5) Alaei's inability to say how he had entered the country and (6) Alaei's contrary statement that he was, in fact, travelling with Tehrani—"provided an adequate basis for the officials to reasonably believe that [Alaei] was not just a mere innocent traveling companion but was traveling *and* acting in concert with [Tehrani] ...." *See Patrick*, 899 F.2d at 172 (emphasis added).

We conclude that, even assuming that Alaei's inability to explain how he entered the country did not itself create reasonable suspicion, it was objectively reasonable for the agents to suspect Alaei of entering illegally or of aiding in Tehrani's illegal entry. In this case there was a conceded connection between Alaei and Tehrani, as to whom reasonable suspicion clearly existed. *See Jaramillo*, 25 F.3d at 1153 (holding that *connection* between suspicious individuals and unsuspicious individuals is distinguishing factor between cases where search or seizure took place in private premises and cases in which search or seizure occurred in public place).

Like Tehrani, Alaei could not explain where he had entered the country. *See Patrick*, 899 F.2d at 172 (curious story told by both defendants provided adequate basis to believe that defendants were acting in concert). Together, Tehrani and Alaei created reasonable suspicion with respect to their right to be in the country and it was reasonable to detain them both. *See, e.g., id.; United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982) (upholding detention of unknown suspect who entered suspected drug location together with individuals as to whom reasonable suspicion existed); *United States v. Munoz*, 738 F.Supp. 800, 802 (S.D.N.Y.1990) (finding probable cause to arrest individual who was passenger in car occupied by suspected kidnappers). Accordingly, Alaei's detention was properly based on reasonable suspicion and the motion to suppress the student identification card was properly denied.

### D. Scope and Duration of the Detention

 Alaei argues that, even if there was reasonable suspicion to detain him, the detention was unreasonable. He reasons that the conditions in which he was held converted the permissible investigatory detention into a *de facto* arrest, requiring probable cause, before the administrative arrest effected at 11:30 a.m. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). He therefore asks us to find that, because there was no probable cause to arrest, the student identification card should have been suppressed as the product of an illegal seizure.

It is well established that

[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may

be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (citations omitted.)

Both the stop and the inquiry must be " 'reasonably related in scope to the justification for their initiation.' " *Brignoni–Ponce,* 422 U.S. at 881, 95 S.Ct. at 2580 (quoting *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884). A permissible investigative stop may become an unlawful arrest if the means of detention are "more intrusive than necessary." *United States v. Perea,* 986 F.2d 633, 644 (2d Cir.1993); *see also Glover,* 957 F.2d at 1011; *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir.1991). We look to "the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, and the physical treatment of the suspect, including whether handcuffs were used." *Perea,* 986 F.2d at 645 (internal citations omitted).

In this case, no force was required and none was used. There were only two government agents involved and, at the point at which each defendant was asked to retire to a private office, only one agent was present. Alaei argues, however, that "the extent to which [his] freedom of movement was restrained," *see id.,* brings this case within the orbit of *Royer.* There, the Supreme Court found that a consensual inquiry was converted into an arrest, in part, because "the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases." *Royer,* 460 U.S. at 504, 103 S.Ct. at 1328. We conclude that Alaei was not subjected to behavior that was more intrusive than necessary.

We examine first the length of Alaei's detention. The period before Alaei attempted to discard the student identification card lasted about thirty minutes. Although there is no "outside time limitation for a permissible *Terry* stop," the length of the detention may be so excessive as to convert it into an arrest. *See Place,* 462 U.S. at 709, 103 S.Ct. at 2645. "[W]hether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly," is crucial. *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575; *see also Glover,* 957 F.2d at 1013; *United States v. Mondello,* 927 F.2d 1463, 1471 (9th Cir.1991). Agent Moran proceeded to make diligent telephone inquiries about the detainees' immigration status immediately after their detention. Alaei does not suggest how the border patrol agent could have ascertained his status any more quickly. *Cf. Place,* 462 U.S. at 709, 103 S.Ct. at 2645. He claims, though, that the agent should have allowed him to proceed with his travel itinerary. He argues that Moran could have arranged for his detention in Nevada if responses to the immigration inquiries warranted that step.

The question, however, "is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe,* 470 U.S. at 687, 105 S.Ct. at 1576. We cannot say that it was unreasonable of Moran not to allow Alaei to travel to a distant state while there was reasonable suspicion that he was in this country illegally.

The agent made speedy and appropriate inquiries in a reasonable way. We decline to hold that a thirty minute detention based on reasonable suspicion is, *per se,* too long. *Cf. Sharpe,* 470 U.S. at 687–88, 105 S.Ct. at 1576 (twenty minutes); *United States v. Mondello,* 927 F.2d 1463, 1471 (9th Cir.1991) (thirty minutes); *United States v. Nurse,* 916 F.2d 20, 24–25 (D.C.Cir.1990) (twenty to thirty minutes); *United States v. Knox,* 839 F.2d 285, 290–91 (6th Cir.1988) (thirty minutes), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); *United States v. Davies,* 768 F.2d 893, 902 (7th Cir.) (forty-five minutes), *cert. denied,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985). Here, the stop "last[ed] no longer than [was] necessary to effectuate [its] purpose...." *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325.

Alaei notes also the "coercive" nature of his detention, stressing that he was taken to a small, private office, that he was advised that he would miss his flight, that his

luggage was seized, and that he was asked to empty his wallet. Alaei argues that these factors indicate that he was not free to leave and that, therefore, he was actually arrested. We agree that Alaei would not have been allowed to depart had he wished to do so. It does not follow, however, that he was under arrest: Alaei has confused arrest with a lawful investigative detention. Whether a reasonable person would have felt free to leave under the totality of the circumstances marks the line between a "fourth amendment seizure of any degree and a consensual encounter...." *United States v. Jones,* 759 F.2d 633, 637 (8th Cir.) (citing *Immigration and Naturalization Service v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) and *United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980)), *cert. denied,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985); *see also Glover,* 957 F.2d at 1008. In this case, of course, we address the line between an investigative detention and an arrest. As we have made clear, that line was not encroached.

Because we have concluded that the "nature and quality of the intrusion on [Alaei's] Fourth Amendment interests" was properly balanced "against the importance of the governmental interests" at stake, Alaei's argument must fail. *See Place,* 462 U.S. at 703, 103 S.Ct. at 2642.

## CONCLUSION

In sum, given the government's permissible interest in preventing the illegal entry of aliens into the country, the fact that reasonable suspicion existed with respect to Alaei, the diligence with which Moran conducted the relevant investigation, and its permissible scope, the disputed detention was lawful. Therefore, the district court properly denied the motion to suppress the student identification card. Accordingly, its judgment is AFFIRMED.