**UNITED STATES of America**

v.

**Luis RAMOS.**

**Criminal No. 3:98CR197 (AWT).**

United States District Court,
D. Connecticut.

Sept. 8, 1999.

Gary D. Weinberger, Thomas G. Dennis, Federal Public Defender's Office, Hartford, CT, Richard S. Cramer, Wethersfield, CT, for Luis Ramos.

## RULING ON MOTION TO SUPPRESS

THOMPSON, District Judge.

### I. Background

The defendant, Luis Ramos, is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He moves to suppress a .22 caliber Smith & Wesson handgun and any additional objects or statements obtained by the Hartford Police Department from him on July 24, 1998. The defendant claims that there was no lawful basis for his seizure by the police and that his encounter with the police exceeded the bounds of an investigatory stop, because the level of restraint used by the police was too intrusive. He argues that the police effected a de facto arrest which was not justified by probable cause that he had engaged in or was about to engage in criminal activity.

For the reasons that follow, the motion is being denied.

### II. Findings of Fact

The court finds credible the testimony given at the suppression hearing by Officer Sabrina Nyenhuis and Officer James Elliot of the Hartford Police Department. Officer Elliot was one of the officers who arrested Mr. Ramos on July 24, 1998. The officers explained the facts known to them and to other Hartford police officers upon which Officer Elliot based his detention and subsequent arrest of Mr. Ramos. Those facts are summarized in the following paragraphs and have been proved by a preponderance of the evidence. See U.S. v. Matlock, 415 U.S. 164, 177, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

At approximately 10:30 p.m. on July 24, 1998 Officer Nyenhuis received a radio transmission from the police dispatcher reporting that an on duty AMR ambulance unit had observed a suspicious person with a gun in the area of Park and Cedar Streets in the Frog Hollow area of Hartford. The ambulance unit has a direct line to the paramedic units at the Hartford Police Department, who sit next to the dispatchers for officers on patrol. The suspect was described as a Hispanic male wearing a plaid shirt, denim shorts, and black sneakers.

Officer Nyenhuis was then informed, via her police radio, that the suspect was heading toward the intersection of Park and Wolcott Streets and the ambulance unit still had the suspect in sight. Within a minute of receiving the dispatch, Officer Nyenhuis arrived at the corner of Park and Wolcott Streets and saw a group of people, all of whom appeared to be juveniles, i.e., under the age of eighteen, congregated near a basketball court with a small fence. Among the group, she saw two Hispanic males wearing plaid shirts, one of whom was also wearing a red baseball cap.

Parking next to the ambulance unit, Officer Nyenhuis asked the paramedics which of the two Hispanic males wearing plaid shirts was the suspect who had been observed with a gun. The paramedics identified the suspect as the one who was *not* wearing the red baseball cap; this individual was later identified as Angel Rivera.

Within seconds after Rivera was identified as the person with the gun, and as Officer Nyenhuis approached him, she saw Rivera turn his back to her and with "furtive movements," Transcript of Hearing, March 9, 1999 ("Tr.") at 15, reach into his waistband, withdraw with both hands an object that he transferred to the Hispanic male wearing the plaid shirt and red baseball cap, who was seated on the fence. The male wearing the red cap, later identi-

fied as defendant Ramos, stood up, took the object and stuffed it in his waistband, and started walking southbound on Wolcott Street. Immediately upon handing over the object to Ramos, Rivera turned to Officer Nyenhuis, threw his hands in the air and engaged in distracting behavior, attempting to engage Officer Nyenhuis in conversation as defendant Ramos walked away. Officer Nyenhuis secured the suspect Rivera as she put out a description over the police radio for defendant Ramos, by broadcasting a reference to the red baseball cap.

Within seconds, Officer Nyenhuis observed officers traveling northward on Wolcott Street apprehend defendant Ramos approximately 25 or 30 yards from her location. The amount of time which elapsed from the point in time where Officer Nyenhuis observed the transfer of the object from Rivera to Ramos to the time that Mr. Ramos was apprehended was less than a minute.

Officer Elliot also received the radio dispatch reporting that an ambulance paramedic unit had observed a suspicious person with a gun in the Park Street area and describing the suspect. Officer Elliot responded to the dispatch, and while driving his patrol car toward Park and Cedar Streets, he continued to hear radio dispatches regarding the situation.

As Officer Elliot arrived at the intersection of Park and Cedar Streets, he learned, via his police radio, that the suspect had headed west on Park Street, and he turned left onto Wolcott Street. When Officer Elliot arrived on Wolcott Street he heard, via his police radio, what he took to be a second description of the original suspect which made reference to the red baseball cap. Proceeding northward on Wolcott Street, Officer Elliot observed a suspect, later identified as defendant Ramos, wearing a plaid shirt and a red baseball cap, and walking toward 10–12 Wolcott Street.

Upon approaching defendant Ramos, Officer Elliot and his partner stopped their marked police cruiser, exited, and identified themselves as police officers. They drew their guns, pointed them at Ramos and ordered him to stop. Ramos immediately complied. He was then ordered to kneel and was secured with handcuffs. Once the defendant kneeled, Officer Elliot returned his gun to his holster. While he was being handcuffed, or immediately thereafter, Ramos stated, without having been frisked or questioned, that he was carrying a gun and indicated its location. Officer Elliot then reached into Ramos' waistband and removed a .22 caliber Smith & Wesson handgun. (Coincidentally, it was determined that Rivera had no gun in his possession.) The time elapsed between the officers' stop of defendant Ramos and the securing of the handgun was approximately seven seconds.

Officer Elliot and his partner subsequently arrested Ramos, and he was charged with carrying a pistol without a permit, breach of the peace, criminal possession of a firearm, and theft of a firearm. At the time they stopped the defendant, Officer Elliot and his partner did not know Ramos' identity.

## III. *Discussion*

### A. *Standard for Investigatory Detentions*

■ Brief investigatory detentions are justifiable if the "officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even if the officer lacks probable cause." *U.S. v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The Officer may not rely on an "unparticularized suspicion or 'hunch'" *Id.* (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). Articulable facts must justify a reasonable suspicion that "criminal activity has occurred or is about to occur." *U.S. v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). However, that "level of suspicion is considerably less than proof of wrongdoing

by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581.

 · If articulable facts constitute the basis for the detention, "the next inquiry is whether its scope and duration are reasonable. The investigation must be as minimal as possible, bearing in mind the circumstances that gave rise to the suspicion." *Tehrani*, 49 F.3d at 58. Factors to consider in making this determination are as follows:

> ... the amount of force used by the police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether handcuffs were used.

*Id.* (quoting *U.S. v. Perea*, 986 F.2d 633, 645 (2d Cir.1993) (internal citations omitted)).

## B. *Reasonable Suspicion*

"[W]here law enforcement authorities are cooperating in an investigation ... the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). *See also, Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir.1989); *United States v. Ceballos*, 719 F.Supp. 119, 124 (E.D.N.Y.1989) ("Knowledge gleaned from others may permissibly enter into the agents' reasonable suspicion determination.") (citation omitted). Even assuming

*arguendo* that Officer Elliot lacked reasonable suspicion based on his personal knowledge, the Hartford police officers on the scene had more than sufficient knowledge, collectively, for an investigative stop of the defendant. Shortly before Ramos was stopped by Officer Elliot, Officer Nyenhuis had observed him in the company of a group of juveniles, which included Angel Rivera. Because Ramos and Rivera were both Hispanic males wearing plaid shirts, Officer Nyenhuis checked with the paramedics to confirm the identity of the individual who had displayed the gun. Rivera was identified to Officer Nyenhuis as the suspect.[1] Within seconds after Rivera was identified as the person with the gun, and as Officer Nyenhuis approached Rivera, she observed Rivera turn his back to her, reach into his waistband and withdraw with both hands an object that he transferred to Ramos, who received the object and placed it in his own waistband. Moreover, immediately after these "furtive movements," Tr. at 15, Rivera turned toward Officer Nyenhuis, threw his hands in the air and engaged in distracting behavior, attempting to engage Officer Nyenhuis in conversation as the defendant walked away from the group on Park Street and headed toward 10–12 Wolcott Street. As she immediately secured Rivera, Officer Nyenhuis broadcast over the police radio a description of defendant Ramos, making reference only to the red baseball cap, the distinguishing feature between Rivera and the defendant being the red baseball cap worn by the defendant.

---

1. There is no genuine issue as to the reliability of the report from the paramedic, as an examination of the totality of the circumstances substantiates the reliability of the tip. *See U.S. v. Bold*, 19 F.3d 99, 102 (2d Cir. 1994). The paramedic's tip was reliable, in part, because the informant's identity was easily verifiable by the police department. *Cf. Id.*, at 103 (anonymous tip verified by officer's observation); *U.S. v. Walker*, 7 F.3d 26, 31 (2d Cir.1993) (unreliable anonymous tip sufficiently verified). Also, the paramedic "did not predict future events." *Bold*, 19 F.3d at 103. Rather, the informant reported an eye- witness observation of a Hispanic male wearing a plaid, shirt, blue jeans and black sneakers who had displayed a gun. *See Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir.1994) (eyewitness informants more reliable). Then, while keeping the suspect within sight, the paramedic continued to update the police with details regarding the suspect's location. Officer Nyenhuis' subsequent observation of the suspect's location and physical description, as well as the suspicious transfer from the suspect Rivera to the defendant Ramos, corroborated significant aspects of the information offered by the paramedic.

■ Thus, while a person's "mere propinquity to others independently suspected of criminal activity" does not by itself constitute probable cause, *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the circumstances leading up to Ramos' detention, included more than the defendant's mere association with Angel Rivera. The furtive exchange between Rivera and the defendant, and Rivera's distracting actions while the defendant quickly left the scene were bases for reasonable suspicion by Officer Nyenhuis that Ramos should be detained and investigated.

The defendant emphasizes that the police did not actually see him receive or brandish a gun, but the paramedic's report that Rivera was in possession of a firearm, coupled with Officer Nyenhuis' independent corroboration of aspects of that tip and her observation of the suspicious transfer from Rivera to Ramos, followed by Rivera's behavior as Ramos immediately left the scene, establish reasonable suspicion for the investigatory stop and frisk of the defendant. *See U.S. v. Bold,* 19 F.3d 99, 104 (2d Cir.1994) ("Where the tip concerns an individual with a gun, the totality-of-the-circumstances test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation.") The defendant's own suspicious behavior negates the inference that he was merely tainted by the behavior of another.[2] *See Tehrani,* 49 F.3d at 59.

■ When Officer Elliot detained Ramos he mistakenly assumed that he was the original suspect, who was later identified as Angel Rivera. Even though Officer Elliot mistakenly believed that he was apprehending the original suspect, his detention of Ramos was not invalid. *The test is whether the officer's actions were unreasonable. Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 1110, 28 L.Ed.2d 484 (1971); *United States v. Valez,* 796 F.2d 24, 28 (2d Cir.1986). *See United States v. Uribe-Velasco,* 930 F.2d 1029, 1033 (2d Cir.1991) (addressing mistaken belief doctrine in the Terry stop context). Officer Elliot's mistaking Ramos for Rivera was not unreasonable because Ramos was the only person Officer Elliot saw in the vicinity of Park and Wolcott Street whose physical appearance was consistent with both the initial and subsequent descriptions of the suspect that had been broadcast over the police radio. *See Valez,* 796 F.2d at 27; *United States v. Jabbar,* 648 F.Supp. 1567, 1570 (S.D.N.Y.1986) (description need not be exhaustive, but sufficiently detailed to prove probable cause as to suspect defendant was mistaken for). Moreover, Officer Elliot in fact detained the very individual Officer Nyenhuis had requested be detained.[3]

### C. Scope of the Encounter

■ The defendant argues that his seizure had all of the "trappings" of an arrest. However, "[w]hether a seizure is an arrest or merely an investigatory detention, depends on the totality of the circumstances," *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir.1991), not merely whether there are present particular indicia of an arrest. It is clear that the encounter here was intrusive. Officer Elliot and his partner ordered the defendant to stop at gunpoint. The defendant was ordered to kneel and was then handcuffed. Howev-

---

**2.** *Cf. United States v. Jaramillo,* 35 F.3d 1146, 1151–1153 (2d Cir.1994), where the court noted that in both that case and *Ybarra,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238, no reasonable suspicion was directed toward those defendants in particular—i.e., there was no evidence of "suspicious statements or any suspicious or threatening gestures" by the defendants. Also, neither case presented evidence that the respective defendants were armed or dangerous.

**3.** Nor was Officer Nyenhuis' failure to state that there was a second distinct suspect unreasonable, given the rapidity of the evolving investigation, and the necessity of a quick police response to a concern that the suspects may be armed or otherwise dangerous.

er, the actions of the officers took place in the following context: at night, two officers approached a suspect, they reasonably believed to have been identified by a reliable source as a suspicious person with a gun.[4] *See Perea,* 986 F.2d at 645. The officers' actions were calibrated to immediately secure a weapon from someone they had reason to suspect was "armed or otherwise dangerous."[5] *Oliveira v. Mayer,* 23 F.3d 642, 646 (2d Cir.1994); *United States v. Alexander,* 907 F.2d 269, 272–273 (2d Cir.1990); *Valdez v. City of East Hartford,* 26 F.Supp.2d 376, 381–383 (D.Conn.1998). Under the circumstances, the intrusive nature of the encounter was not unreasonable.

 The mere presence of drawn guns or handcuffs does not automatically transform a Terry stop into a de facto arrest. *Oliveira,* 23 F.3d at 646–7; *United States v. Nargi,* 732 F.2d 1102, 1106 (2d Cir.1984); *Dempsey v. Town of Brighton,* 749 F.Supp. 1215, 1222 (W.D.N.Y.1990). With respect to the display of guns, factors to consider include "the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, [and] the reaction of the suspect to the approach of police …" *Id.* (quoting *U.S. v. Harley,* 682 F.2d 398, 402 (2d Cir. 1982)). In the present case, the officers reasonably believed the defendant had been identified as a suspicious person with a gun, and he was being apprehended at approximately 10:30 at night on a public street. Notwithstanding the fact that Ramos fully complied with orders from the police officers as those orders were given to him, the officers' actions were reasonably designed to secure the safety of themselves, the public and the defendant. Tragic consequences can be the result when police officers misinterpret a suspect's body language or sudden movements at the moment of apprehension. Handcuffing the defendant allowed the officers to be certain the status quo would be maintained while they quickly and safely secured the firearm they believed to be in the defendant's possession. Moreover, once the defendant kneeled, Officer Elliot returned his gun to his holster. While a defendant's compliance with orders from police officers may be a relevant consideration in the context of a more lengthy encounter, it is not a relevant consideration here because the encounter began and ended in a matter of seconds.

Finally, in examining whether the duration of the encounter was reasonable, courts consider whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe,* 470 U.S. 675, 686,

---

4. Hartford police officers testified at the suppression hearing that the Frog Hollow area of Hartford is a high crime area, and the government made reference to that fact, no doubt in reliance upon language that can be found in various opinions. *See, e.g., Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Valez,* 796 F.2d 24, 27 (2d Cir.1986). The court did not weigh as a factor in its analysis the fact that the incident occurred in a high crime area, however, as that fact does not appear to be relevant. The situation in this case merits treatment as an investigatory detention, regardless of whether it happened in a high crime area. While police officers may be more vigilant and have increased patrols in a high crime area, the fact that a particular individual who is under police scrutiny happens to be in a high crime area does not make that particular *individual* any more suspicious or potentially dangerous than he or she otherwise would be. Moreover, if the mere fact that a chain of events occurred in a high crime area is a material consideration, the logical result is that residents (law-abiding and not) of such areas are afforded less in the way of protection from unreasonable seizures by law enforcement authorities than their peers who are fortunate enough to live in neighborhoods with better reputations. Thus, the court concurs with the concern expressed in the defendant's memorandum. *See* Def. Reply Brief at 1–2.

5. To the extent the defendant argues the standard is "armed and dangerous" that standard is also satisfied. *See Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). This analysis includes an assessment of whether "the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* The approximately seven second stop and frisk of the defendant was designed to quickly respond to the officers' safety concern and was of reasonable duration for a Terry stop under the circumstances. *See U.S. v. Martinez*, 634 F.Supp. 1144, 1153 (S.D.N.Y.1986) (brief protective search justified by belief suspect was armed). *See also*, cases cited therein. *Cf. United States v. Babwah*, 972 F.2d 30, 33–34 (2d Cir.1992) (original stop and search of baggage followed by forty minute detention, even though search indicated agent's suspicions were unfounded, transformed investigatory stop into de facto arrest).

As the court concludes that there was a valid Terry stop in this case, it does not reach the issue of whether there was probable cause for a de facto arrest.

D. *Statements Made During the Terry Stop*

 The defendant has moved to suppress any statements made while he was detained by the police. Over a matter of seconds, the defendant was stopped, ordered to kneel, and handcuffed. While Ramos was being handcuffed, or immediately thereafter, he stated that he was carrying a gun and informed the officers of its location, without having been frisked or questioned. The defendant's statements are admissible because they were spontaneous and voluntary and made in the absence of police questioning or any other conduct by the police officers "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *United States v. Gelzer*, 50 F.3d 1133, 1138 (2d Cir.1995); *United States v. Colon*, 835 F.2d 27, 30 (2d Cir.1987).

**IV.** *Conclusion*

Having determined that the detention of the defendant was lawful and that the defendant's statements regarding the possession of a firearm were offered voluntarily, without prior questioning by the police officers, the court finds that both the firearm found in the defendant's waistband and his statements regarding that firearm are admissible. Accordingly, the defendant's Motion to Suppress Evidence [doc. # 11] is hereby DENIED.

It is so ordered.