Joseph M. MENDOZA and Lionel Goodman, Plaintiffs,

v.

CITY OF ROME; Police Department of the City of Rome, New York; Merino Ciccone, Individually and as Chief of Police of the City of Rome; Joseph Griffo, Individually and as Mayor and Public Safety Commissioner of the City of Rome; Ray Arcuri; Dominic Coriglino; Fred Rebinski; Investigator John Keyes; and Other Unknown Police Officers of the City of Rome, Individually and as Police Officers of the City of Rome; and the County of Oneida; Oneida County Sheriff's Department; Mary Wilson; Charles Schedarie; and Other Unknown Members of the Oneida County Sheriff's Department, Individually and as Deputy Sheriffs of the Oneida County Sheriff's Department,[1] Defendants.

No. 96–CV–1970.

United States District Court, N.D. New York.

Oct. 5, 1999.

---

**1.** The caption incorrectly identifies two defendants: "Mary Wilson" should read "Mary Willson" and "Charles Schedarie" should read "Charles Scheiderich."

138

## MEMORANDUM DECISION AND ORDER

MUNSON, Senior District Judge.

Plaintiffs' instant action, filed pursuant to Title 42 U.S.C. §§ 1983 and 1988, alleges defendants used excessive force and falsely arrested plaintiffs in violation of their rights under the First, Fourth, Fifth, Eight and Fourteenth Amendments of the United States Constitution. They seek compensatory and punitive damages, as well as attorneys fees and costs. Currently before the court are defendants' motions for summary judgment, which plaintiffs oppose. After careful consideration, and for the reasons that follow, the court grants defendants' motions and dismisses plaintiffs' complaint.

## BACKGROUND

At about 9:50 p.m. on September 12, 1994, several Oneida County Sheriff's Department ("OCSD") deputies—Warcup, Willson, Dodge and Bauer—arrived at the home of Albert Barnes in Lee, New York to investigate an armed robbery and shooting that had taken place there earlier that evening. Barnes told the deputies that his house had been entered by two males, one black the other white. Both were about six feet tall and weighed between 170 and 180 pounds. Barnes informed the police that the black male had shot him in the leg during an attempted robbery. Deputy Warcup radioed the details of the crime and the suspects' descriptions to the OCSD's dispatcher, as well as to other OCSD patrols in the area.

Plaintiffs Lionel Goodman and Joseph Mendoza, meanwhile, were driving along in a flatbed pickup truck through Lee. Goodman is black; Mendoza is white. Both wore baseball caps that evening.

Following their meeting with Barnes, deputies Dodge and Bauer were instructed to investigate a report of a light colored flatbed pickup truck occupied by a black and a white male that just had been ob-

Law Offices of Kenneth P. Ray, P.C., Utica, New York, for plaintiffs; Charles W. Watson, of counsel.

Office of the Corporation Counsel, City of Rome, Rome, New York, for defendants the City of Rome; the City of Rome Police Department; Merino Ciccone; Joseph Griffo; Ray Arcuri; Dominick Coriglino; Fred Rebinski; John Keys; and Other Unknown Police Officers of the City of Rome; Gregory J. Amoroso, of counsel.

Gorman, Waszkiewicz, Gorman & Schmitt, Utica, New York, for defendants County of Oneida, Oneida County Sheriff's Department; Mary Willson; Charles Scheiderich; and Other Unknown Members of the Oneida County Sheriff's Department; Bartle J. Gorman, of counsel.

served in the area at the intersection of Skinner Road and Lee Valley Road in Lee. They proceeded to this intersection in their patrol car and were told by Lee fire department members that moments earlier the described vehicle had turned south onto Lee Valley Road from Skinner and was heading toward Route 69. Dodge and Bauer radioed this information to other patrols in the vicinity.

At 10:20 p.m., the OCSD notified Deputy Chrysler to report with his K–9 to the Barnes' residence. Within a half hour, Chrysler was heading in his own vehicle on Route 69 from Rome toward Lee. While en route, he received a broadcast that two male suspects, one black and one white, traveling in a pickup truck with a flatbed, were heading toward Route 69 on the Lee Valley Road. The deputy continued along Route 69 until he saw the suspects' vehicle—plaintiffs' truck—pass him heading in the opposite direction. He then turned his vehicle and gave chase. Roughly two miles later, he caught up with the truck and called the OCSD's dispatcher, Deputy Schrader. Chrysler advised that he was following a flatbed pickup truck, with two males wearing baseball caps, approaching Rome, New York. Schrader directed other patrols to this location.

Deputy Mary Willson had left the crime scene and was on her way to St. Elizabeth's Hospital in Utica, New York, to interview the crime victim further. En route, she, too, monitored the dispatcher's communication concerning the suspects' truck. She notified the dispatcher of her location and was instructed to assist Deputy Chrysler. At about this time, she saw both vehicles—the suspects' and Chrysler's—pass her going in the opposite direction, so she made a quick 180 degree turn, approached plaintiffs' vehicle, and activated her patrol car's emergency lights.

At approximately 10:30 p.m., the Rome Police Department ("RPD") received a teletype from the OCSD that informed them of the armed robbery and shooting in nearby Lee. It described the two suspects as black male and a white male wearing baseball hats and driving a flatbed pickup truck. RPD Officer Jay DiMaggio, who received the teletype, distributed it by telephone to other RPD officers, including defendant Dominick Corigliano.

About twenty-five minutes later, RPD Officer Scott Hall heard a radio transmission from the OCSD stating that a vehicle believed to be involved in the Lee armed robbery was proceeding east on Erie Boulevard in Rome, coming from the direction of the Town of Lee. Hall drove to Erie Boulevard and observed plaintiffs' flatbed pickup truck traveling the street, followed by a small dark colored vehicle and an OCSD vehicle with its emergency lights flashing. Officer Hall activated his emergency lights and likewise gave chase.

When the plaintiffs' truck pulled into a parking lot, Willson pulled along its driver's side. She exited her patrol car, removed her service pistol, and pointed it in the direction of plaintiffs' vehicle.

Corigliano had heard a radio transmission that the OCSD had stopped two suspects at a parking lot at the intersection of Erie Boulevard and South Madison Street, so he drove his police vehicle to that site. The several spotlights from the OCSD's patrol cars illuminated the truck and enabled Corigliano to see that its two occupants were a black male and a white male each wearing a baseball cap. Thus, while Willson aimed her sidearm at plaintiffs' truck, Corigliano addressed plaintiffs over his patrol car's public address system. With the OCSD's consent, he commanded plaintiffs to step out of the pickup truck with their hands on their heads and to lie on the ground. Plaintiffs obeyed these commands and exited their vehicle. Willson covered Bauer as he approached the vehicle's driver's side and handcuffed Goodman; Mendoza was handcuffed on the opposite side of the vehicle.

Willson did not recognize either of these people and had no physical contact with them. She left the location shortly after

11:00 p.m. and continued to St. Elizabeth's Hospital in Utica to interview the crime victim. For his part, Hall observed plaintiffs' detention from his patrol car, then left the vicinity. RPD Officer Ray Arcuri, also a defendant in this action, observed the stop from a street next to the parking lot containing the pickup truck. Several spectators were approaching the parking lot from Adams Street and Officer Arcuri drove his patrol vehicle to the intersection of Adams and South Madison Streets and notified the advancing spectators to return to their cars and depart the area. He remained at the intersection for about two minutes before leaving the area.[2]

In addition to Deputy Willson, several other members of the OCSD arrived at the scene, namely deputies Ruhm, Dodge, Chrysler and Bauer.[3] Following plaintiffs' compliance with Corigliano's orders, Ruhm searched the interior of the passenger side of the vehicle, while Dodge searched the interior of the driver's side of the truck. Ruhm attempted to search a locked tool box behind the vehicle's cab, but it was locked. Plaintiff Goodman told him where the tool box key was located; and once the box was opened, the deputies discovered automobile parts. No weapons or evidence of the robbery were found as a result of these searches.

Goodman and Mendoza were interviewed. They told the officers that they were returning from purchasing automobile transmission parts in the Town of Lee, and a telephone call confirmed this information. Plaintiffs were uncuffed and released immediately, and the deputies explained what had occurred and why they were stopped. The stop and detainment lasted approximately twenty minutes.

**2.** Although named as defendants, RPD officers Fred Rebinski and John Keyes were not present that evening and had no involvement with the stop of plaintiffs' truck.

**3.** Charles Scheiderich, named as a defendant in this suit, was off-duty on the night in question and was at his residence when the stop took place.

## DISCUSSION

### I. Defendants' Motions

Two motions are before the court: the Rome defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, whereas the Oneida defendants have labeled their motion both as a motion for summary judgment under Rule 56, or, in the alternative, as a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Rather than considering the alternative motion to dismiss, the court will treat both motions as ones for summary judgment: both plaintiffs and defendants have referred to documents outside of the pleadings, meaning that "all parties [have been] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b)(6).[4]

Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A motion for summary judgment may be granted when the moving party carries its burden of showing that no triable issues of fact exist. *See Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *See id.; United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) *(per curiam ).* If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that

**4.** Although plaintiffs entered opposition to the Rome defendants' summary judgment motion, they did not oppose the Oneida defendants' dispositive motion. The information contained in plaintiffs' opposition papers is sufficient to address both motions, however, so the court will consider plaintiffs' papers sufficient to oppose both motions.

there is a genuine issue for trial." Fed. R.Civ.P. 56(e). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *See Id.* at 250–251, 106 S.Ct. at 2511.

The thrust of plaintiffs' argument is that summary judgment is premature because discovery has not been completed. Admittedly, Rule 56 permits courts to review depositions, answers to interrogatories, and admissions on file in ruling on summary judgment motions, but does not require that discovery take place before a motion for summary judgment can be considered. *See Banks v. Mannoia*, 890 F.Supp. 95, 97 (N.D.N.Y.1995) (McAvoy, C.J.). Indeed, summary judgment can and often should be granted without discovery. *Id.* Problematically, plaintiffs request additional discovery merely by reference to Rule 56(f)—the rule governing further discovery—and their putative need for it in an unsworn opposition document entitled "STATEMENT OF RELIEF REQUESTED." This document, however, is not an adequate substitute for a Rule 56(f) affidavit.

■ "The purpose of the affidavit is to ensure that the nonmoving party is evoking the protections of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition." *First Chicago International v. United Exchange Co. Ltd.*, 836 F.2d 1375, 1380 (D.C.Cir.1988). Moreover, the failure to file an affidavit under Rule 56(f) is in itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate. *See Burlington Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985). Even if plaintiffs had followed the requisite procedure, the court still finds no basis for further opportunity for discovery. This Circuit has established a four-part test for the sufficiency of an affidavit submitted under Rule 56(f). The affidavit must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of fact; what efforts the affiant has made to obtain these facts; and why those efforts were unsuccessful. *See Hudson River Sloop Clearwater, Inc. v. Department of Navy*, 891 F.2d 414, 422 (2d Cir.1989). "A 'bare assertion' that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." *Sundsvallsbanken v. Fondmetal, Inc.*, 624 F.Supp. 811, 815 (S.D.N.Y. 1985) (*quoting Contemporary Mission, Inc. v. United States Postal Service.*, 648 F.2d 97, 107 (2d Cir.1981)).

■ This case has been extant for a considerable time. The complaint was filed On December 16, 1996 and, according to the record, all discovery was to be completed by September 1, 1998. Plaintiffs have had ample time during this period to complete their discovery efforts and conduct depositions. While it true that the moving defendants requested a discovery conference, they did so to obtain the court's assistance concerning alleged incomplete discovery answers submitted by the plaintiffs. Prior to filing responsive papers on the instant motion, moreover, plaintiffs never requested an extension of the discovery period. There has been no showing of how plaintiffs' ability to obtain information from the defendants was impeded or restricted. A party who both fails to use the time available for discovery and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery. Plaintiffs have had ample time in which to pursue discovery that they now claim is essential. *Cf. Person v. New York Post Corp.*, 427 F.Supp. 1297, 1301 (E.D.N.Y.1977).

■ Defendants, moreover, have provided detailed affidavits from the police offi-

cers describing the pursuit, brief investigative stop and release of the plaintiffs, while plaintiffs have offered no objective facts or evidence exhibiting inappropriate conduct by defendants. Plaintiffs have failed to meet the requirements of the test set forth in *Hudson River Sloop Clearwater v. Dept. of the Navy,* and they have had a full and fair opportunity to discover facts relevant to their claims. Insofar as plaintiffs attempt to raise an objection under Rule 56(f), that objection is denied and the court will address the instant motions.

## II. Detaining Suspects

 In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a police officer has the right to stop and detain a citizen if the officer's action was reasonable. Police making a *Terry* stop, however, must be able to elicit something more than an "inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citation omitted). The police must denote "specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion." *Id.* at 12, 109 S.Ct. at 1588 (citation omitted). Under *Terry* and its progeny, an investigating officer may briefly detain an individual for questioning so long as the officer has "a reasonable suspicion supported by clearly defined facts that criminal activity may be afoot." *Id.* at 7, 109 S.Ct. at 1585. If an investigative stop is appropriately premised, its scope and duration must be reasonable. *See United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir.1995).

A circumscribed stop does not transgress the Constitution, even though probable cause may be wanting. *See United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992). Additionally, the officer then may frisk the individual for weapons if the officer reasonably believes the person to be armed and presently dangerous. *See Terry,* 392 U.S. at 21–24, 88 S.Ct. at 1879–

83. An otherwise intrusive detention has been found to be a protected *Terry* stop where police had a reasonable basis to believe the suspect was carrying a weapon or otherwise menacing. Even in cases where police have handcuffed or place persons in patrol cars, courts have determined that under the particular circumstances in each given case, the seizures were valid *Terry* stops rather than full scale arrests. *See United States v. Parr,* 843 F.2d 1228, 1230 (9th Cir.1988); *see also Dempsey v. Town of Brighton,* 749 F.Supp. 1215 W.D.N.Y.1990, *aff'd without opinion,* 940 F.2d 648 (2d Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 338, 116 L.Ed.2d 278 (1991) (no constitutional violation during investigative stop where police had unholstered guns, handcuffed plaintiff and conducted pat down search for weapons because plaintiff resembled bank robbery suspect and police were reasonable in investigating him); *United States v. Lechuga,* 925 F.2d 1035, 1039–40 (7th Cir.1991) (police may, in appropriate circumstances, block suspect's vehicle, order suspect to lie and the ground and detain suspect for long periods while the police check for outstanding warrants); *Michigan v. Long,* 463 U.S. 1032, 1050 n. 14, 103 S.Ct. 3469, 3481 n. 14, 77 L.Ed.2d 1201 (1990) (police may make area search for weapons during investigative stop in situations where officers have a reasonable belief that suspect is potentially dangerous to them).

 More specifically, in evaluating whether an investigative stop is reasonable under the Fourth Amendment, the reviewing court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. Under the first element of this inquiry, an investigative stop does not meet the requirements of the Fourth Amendment unless "specific articulable facts, together with reasonable inferences from those facts, reasonably warrant suspicion"

that the individual stopped was engaged in criminal activity. *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). Under the second element, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop ... the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

■■■ In this case, the defendant police personnel had reasonable grounds for believing plaintiffs might be suspects in the commission of serious crimes. It is undisputed that two burglars entered Barnes' dwelling in Lee, New York on September 12, 1994, and that he had been shot by one of the intruders. Barnes described the duo to the police at the crime scene as a black and a white male, each about six feet tall and weighing between 170–180 pounds, and stated the black male had fired the shot that wounded him. One of the investigating officers then radioed this information to the OCSD's dispatcher and other OCSD patrol cars operating in the area. This dispatcher further disseminated the crime report with the suspects' description to other police patrols and law enforcement departments in the area.

Police personnel in the vicinity received the report of the crime and the suspects' description and immediately instituted a search for the culprits. A truck with two occupants, a black driver and a white passenger, coming from the direction of the crime scene, was soon located by police patrols and detained for investigation. As discussed above, after the truck had been stopped, officers drew their guns and ordered the truck's occupants—plaintiffs—to exit and lie on the ground. They were handcuffed and frisked. The frisk and search of the truck yielded no weapons or evidence tying plaintiffs to the armed intrusion. Upon inquiry as to their whereabouts during the time the Barnes was shot, plaintiffs stated they were purchasing automobile parts. The officers on the scene quickly verified this information with a phone call and immediately released plaintiffs.

Defendants comported themselves properly: serious crimes, including a shooting, just had been committed and the plaintiffs, who were traveling from the direction of the crime scene, resembled the description of the perpetrators. Under the conditions, the officers were justified in acting cautiously and it was not unreasonable to conclude that the plaintiffs, who resembled the suspects, had a gun and were willing to use it. The police diligently and commendably pursued a means of investigation that was likely to confirm or dispel their suspicions. *See United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Plaintiffs were handcuffed only briefly and defendants made speedy and appropriate inquiries in a plausible way which led to their quick release. In *United States v. Tehrani,* 49 F.3d 54, 61 (2d Cir.1995), the Court of Appeals held that a thirty minute detention based on reasonable suspicion is not, *per se,* too long: the time of the investigative stop here was approximately twenty minutes, and likewise "no longer than [was] necessary to effectuate [its] purpose." *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325.

### III. Qualified Immunity

■■■ As the court has found *infra,* the defendants who took part in the various aspects of plaintiffs' brief detention acted reasonably under Fourth Amendment criteria. However, even if the court had determined that there was insufficient basis for the stop, or that the stop was too long, the officers are safeguarded by qualified immunity.

■■■■ Qualified immunity is a defense that, if proven, shields government agents from individual liability for civil damages insofar as their conduct does "not

 

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir. 1991) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2728, 73 L.Ed.2d 396 (1982)). Even if the rights in question are clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky,* 929 F.2d at 925.

 Police officers are protected from § 1983 liability if it was "objectively reasonable" for them to believe they were acting in a way that did not violate a clearly established federal right. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). The police officers involved in the stop of the plaintiffs are entitled to qualified immunity on the grounds that their actions were objectively reasonable unless "no officer of reasonable competence could have made the same choice in similar circumstances." *Id.* at 420–21. The facts surrounding the plaintiff's investigative stop have already been detailed in this memorandum and the court finds that reasonable police officers certainly could have believed that the procedures employed by the officers in conducting the stop were proper and not unconstitutionally excessive in light of clearly established law.

## IV. The Municipal and County Defendants

In *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court ruled that a municipality could incur § 1983 liability "only when a municipality, through the execution of its policies actually deprives an individual of his constitutional rights." In their complaint, plaintiffs raise various claims against the city of Rome, its mayor and chief of police (the latter two in both their individual and official capacities) and against those RPD police officers dis-

cussed above. Plaintiffs allege a constitutional rights deprivation policy existed in Rome that was implemented by the various defendants. Similar claims are asserted against Oneida County, the OCSD and several of its deputy sheriffs in their individual and official capacities.

 A local government cannot be held liable under § 1983 "unless action pursuant to official policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. The court, of course, already has found that the actions of the respective defendant officers and deputies did not violate plaintiffs' constitutional rights; naturally it follows that plaintiffs' *Monell* claims cannot have merit.

## CONCLUSION

Based upon the foregoing, defendants' summary judgment motions are **GRANTED** and the complaint is dismissed.

**IT IS SO ORDERED**